15399

GODFREY v. WATTS MILLS *ET AL.*

(19 S. E. (2d), 902)

No-vember, 1941.

*Messrs. Mann & Arnold,* of Greenville, S. C., for appellants,

Mr. *John Bolt Culbertson,* of Greenville, S. C., for respondent,

April 17, 1942.

The opinion of the Court was delivered by MR. ASSOCIATE JUSTICE FISHBURNE.

On September 3, 1937, while respondent was in the employ of Watts Mills, she sustained an injury by accident arising out of and in the course of her employment, the injury being fracture of the right arm just above the wrist. The Aetna Casualty and Surety Company was the insurance carrier of Watts Mills under the Compensation Act. The respondent was furnished medical treatment and has been paid all compensation due, with the exception of that alleged to be due for serious bodily disfigurement under Section 31 (t) of the Compensation Act, 39 St. at Large, p. 1248. She was pronounced able to return to work by the attending physician in January, 1939.

In April, 1941, respondent filed application with the South Carolina Industrial Commission asking for an award for serious bodily disfigurement, and this question came on to be heard before Commissioner Coleman C. Martin on April 30, 1941. Evidence was taken and thereafter on June 7, 1941, Commissioner Martin filed his opinion finding serious bodily disfigurement, and awarded to respondent the sum

of $500.00 under Section 31 (t) of the Compensation Act. The full commission upon review sustained the single commissioner, and the award was thereafter affirmed by the Circuit Court. The appeal comes to us from this judgment, and is wholly dependent upon the decision of the question as to whether there is any evidence in the record to sustain the award for serious bodily disfigurement.

The claimant at the time of the hearing was forty years of age, and had been engaged in textile employment since she was thirteen years old. Following the injury she was paid on the basis of a sixty per cent. functional loss of the right arm. As a trained and experienced textile worker, her time was spent for several years in the weave room, spinning and spooling, but for several months prior to her accident she was engaged in "picking out fine threads";—as explained by her, she had to "take out the bad places in the cloth," with her right hand.

Following the accident, the plaintiff carried her right arm in a sling across her body for a long period of time, so that such posture became habitual after the removal of the sling. Two and a half years after the injury she sought re-employment with the mill she had been working for, and the superintendent after looking at her arm, told her that there was nothing she could do in the mill.

Dr. J. Warren White, appellants' witness, furnished the only medical testimony. He saw her first on November 4, 1937, and last saw her on August 29, 1939. He stated that he observed considerable improvement in the right hand,— "that she could make approximately a full fist, except for the ring finger, which came only within an inch and a half of the base of the palm, and the little finger, which came to within an inch." Dr. White expressed the opinion that with use still further improvement could definitely be expected. In his testimony, he referred to the fact that her right shoulder, by reason of the long use of the arm sling, had drooped, and was lower than the left shoulder, and said, "In a person that is apprehensive, such as she is, with a definite history

such as she has had involving that arm, you sort of unconsciously give way to it. It is purely a functional affair that does not have any special significance."

We further quote the doctor's testimony:

"Q. And that (the drooped shoulder) is due to her voluntary action and not to what you might say directly resulted from the injury? A. No, I would not say voluntary, I would say incidental reaction to a sore hand.

"Q. Now, then, doctor, I want to ask you with reference to the disfigurement. In your opinion do you find any disfigurement of the arm or hand today? A. If she holds it as she is holding it at the present time, I might say that— and could not move it in a normal position, I would say there was a disfigurement present, but I see no reason why she has to hold it in that particular position.

"Q. In other words, she is making the disfigurement? A. She has favored that arm so long that she unconsciously holds it in an awkward position.

"Q. Would you say it is unsightly? A. Well, let me qualify that. It is unsightly as she is holding it that way, but I don't feel that she needs to hold it like that.

\*     \*     \*

"Q. What about from the appearance, did you think her chances of securing employment, do you think they are lessened? A. Yes, if she holds her hand in that position."

Dr. White further testified that the claimant "does have some permanent loss of the use of that hand"; and that the accident to her hand affected her mental outlook and contributed to an inferiority complex.

In another portion of the record the doctor testified as follows:

"Q. I ask you if it is not reasonable to say it is in this woman's case where you say you see no objective showing of the arm there and the general posture, if it is not reasonable to assume that her mental condition causes her to do that? A. Well, I think that is what it is, a mental. Whether it is voluntary or not, I don't know.

"Q. And if it had not been for the accident, she would not be in this condition today? A. No.

"Q. She would not be nursing this arm and drooping the shoulder? A. No."

Another witness who had known the claimant for several years testified that the plaintiff's right shoulder drooped, and that she constantly carried her right arm in a protective position, across her body; that this posture rendered her body unsightly and somewhat repulsive. The claimant had suffered a loss in weight from 143 pounds to 112 pounds.

The claimant testified that she knew when she applied for work with her old employer two and a half years after the injury, that she would be unable to obtain employment, or to perform her accustomed work because of her disfigurement,.but that she was willing to try. Furthermore, that her appearance had made her sensitive; that people would notice the arm, and would say something about it; she would see people turn around on the street and watch her, and some would ask, "Why was I hump-shouldered on one side?"

Recent cases have discussed very fully the law applicable to cases of this kind: *Haynes v. Ware Shoals Mfg. Co.*, 198 S. C., 75, 15 S. E. (2d), 846; *Jewell v. R. B. Pond Company*, 198 S. C., 86, 15 S. E. (2d), 684; *Tinsley v. Walgreen Drug Company*, 197 S. C., 415, 15 S. E. (2d), 667; *Burnette v. Startex Mills*, 195 S. C., 118, 10 S. E. (2d), 164; *Stone v. Ware Shoals Mfg. Company*, 192 S. C., 459, 7 S. E. (2d), 226.

In the case of *Murdaugh v. Robert Lee Construction Company*, 185 S. C., 497, 194 S. E., 447, 452, this Court approved the following definition of "disfigurement," from Black's Legal Dictionary: "That which impairs or injures the beauty, symmetry or. appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner."

In *Stone v. Ware Shoals Mfg. Company, supra* (192 S. C., 459, 7 S. E. (2d), 228), we stated: "The evidence ought to show that the bodily disfigurement for which compen-

sation is sought bears some relation to the capacity or incapacity, by reason of it, to secure profitable employment. There should be some showing that by reason of the disfigurement there is no longer any market for the claimant's labor."

And it was further held in the same case, in accordance with previous decisions, that the word "serious," and used in the Act connotes that the disfigurement should be more than slight, and partaking of permanency.

In our opinion, there is evidence in the record bringing the claimant's injury within these definitions and meeting the requirements of the rule announced in the foregoing cases. At least there is sufficient evidence upon which to base an award.

Judgment affirmed.

Mr. Chief Justice Bonham, Messrs. Associate Justices Baker and Stukes, and Circuit Judge G. B. Greene, Acting Associate Justice, concur.